UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO.: 21-CR-340 |
| ) | |
| ALEJANDRO PARRA BUSTAMANTE, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, respectfully submits this sentencing memorandum in the above captioned matter. On February 6, 2025, the Defendant, Alejandro Parra Bustamante ("Defendant"), pled guilty pursuant to a Plea Agreement to one count of conspiracy to distribute cocaine for unlawful importation into the United States. On July 29, 2025, this Court held a pre-sentencing evidentiary hearing at the request of the Government and heard testimony from Homeland Security Investigations ("HSI") Special Agent ("SA") Benjamin Baker and received evidence regarding the total amount of controlled substances involved in the offense for purposes of calculating the base offense level. Following the hearing and supplemental briefing by the Government and the Defendant, this Court found that the offense involved 450 kilograms or more of cocaine. Min. Order, Oct. 29, 2025. For the reasons set forth herein, the Government requests that this Court sentence the Defendant to 210 months' imprisonment, five years of supervised release, and a mandatory $100 special assessment. The Government's recommended sentence is at the low end of the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range as calculated by the Probation Office. The Defendant is subject to the statutory mandatory minimum of ten years imprisonment and 5 years of supervised release.

1

I.  **INTRODUCTION**

The Defendant, a leader of Colombia-based drug trafficking organizations ("DTO"), the Shottas and Clan de Bustamante, conspired with his co-defendant, Jorge Eliecer Florez Alvarez ("Florez Alvarez"), and others to sell more than 450 kilograms of cocaine for importation into the United States. The Shottas and Clan de Bustamante operated from Buenaventura, Colombia, the country's main seaport and a primary transportation hub for cocaine moving out of Colombia to Central America and then on to Mexico and the United States. An undercover investigation conducted by HSI utilizing a Confidential Informant ("CI") exposed the Defendant as a source of bulk quantities of cocaine. Dkt. No 85 at 2-3. As part of the conspiracy, the Defendant organized and directed two deliveries of cocaine samples totaling 15 kilograms that were sent to Tucson, Arizona, and repeatedly discussed selling 500 to 1,000 kilograms more of cocaine to the CI and U.S. buyers. *Id.* at 5-6; Joint Statement of Stipulated Facts, Dkt. No. 46 ¶ 7.

In light of the magnitude of this narco-trafficking conspiracy, the Defendant's leadership role therein, and other 3553(a) factors, the Government's recommended sentence of 210 months is appropriate and just.

II.  **FACTUAL BACKGROUND**

HSI began investigating the Defendant in 2019, as part of a broader investigation into the Shottas and Clan de Bustamante. Dkt. No 85 at 2. Beginning in 2019, the Defendant and the CI engaged in numerous conversations, which the CI recorded, about drug trafficking and specifically, the sale of 500 to 1,000 kilograms of cocaine that would be sent to the United States. *Id.* at 3. They also discussed details about payment and cocaine production. *Id.* at 4. During these discussions, the Defendant and the CI frequently used coded language to refer to cocaine and cocaine production. *Id.* at 3, 9. Furthermore, consistent with evidence obtained in this

2

investigation, the Defendant acknowledged his leadership role in this conspiracy in his Plea Agreement. *Id.* at 1; Dkt. No. 45, Plea Agreement, ¶ 3(b).

In coordination with Colombian National Police and HSI, the CI made two cocaine purchases from the Defendant to gain his trust for the larger cocaine deal. Dkt. No. 85 at 3-5. First, on May 19, 2019, the Defendant organized the sale of three kilograms of cocaine to the CI, which was delivered to the CI in Yumbo, Colombia. *Id.* at 3-4. The CI subsequently told the Defendant that the cocaine was received in Tucson, Arizona. *Id.* at 4. Following the first transaction, the Defendant and the CI discussed the quantity, transportation, and destination of a second cocaine sample. *Id.* During the interim, the Defendant also sent Florez Alvarez to a mountainous region outside of Buenaventura to source more cocaine. *Id.* at 5. Then on or about July 6, 2019, the Defendant sold another twelve kilograms of cocaine to the CI, which was delivered in Bogota, Colombia. *Id.* at 5; Dkt. No. 46 ¶ 4.

After the two sample sales totaling fifteen kilograms, the Defendant continued to plan for the sale and shipment of 500 to 1,000 kilograms of cocaine to Tucson, Arizona, and negotiated with the CI on details such as the amount of deposit and the timing of the payment for the larger deal. Dkt. No. 85 at 5-6; Dkt. No. 46 ¶ 7. The negotiation continued after July 28, 2019, but the transaction was not completed because they did not agree on the amount of advance payment. Dkt. No. 85 at 6; Dkt. No. 46 ¶ 7.

### III. PRESENTENCE INVESTIGATION REPORT

#### A. Statutory Penalties

Before the evidentiary hearing, on May 27, 2025, the Probation Office issued a final Presentence Investigation Report ("PSR"). Dkt. No. 60. The PSR correctly sets forth the statutory penalties applicable to the Defendant. The Defendant faces a mandatory minimum sentence of ten

years' imprisonment, a maximum sentence of life imprisonment, a fine up to $10,000,000, and a term of supervised release of at least five years. Dkt. No. 60 ¶¶ 77, 82, 95. Additionally, the Defendant is subject to a mandatory special assessment of $100. *Id.* ¶ 96.

### B. Sentencing Guidelines Calculation

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, not mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*; *United States v. Booker*, 543 U.S. 220, 222 (2005) (holding that the Guidelines were not mandatory). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

The Plea Agreement sets forth the Guidelines calculation, which the Probation Office used to calculate the Defendant's offense level. Dkt. No. 64 ¶¶ 26-37, Dkt. No. 45 ¶ 3. The Defendant reserved the right to contest the base offense level of 38, pursuant to U.S.S.G. § 2D1.1(c)(1), as applied by the Government and Probation. Dkt. No. 45 ¶ 3(a). This Court has determined, "based on the testimony and evidence presented at the July 29, 2025 Evidentiary Hearing, that the offense involved 450 kilograms or more of cocaine and that the Base Offense Level is 38 under the Sentencing Guidelines." Min. Order, Oct. 29, 2025. The parties agreed to a two-level increase, pursuant to 3B1.1(c), because the Defendant was an organizer, leader, manager, or supervisor in a criminal activity. Dkt. No. 45 ¶ 3(b). The Defendant is ineligible for any offense level decrease under the zero-point offender provision, pursuant to U.S.S.G. § 4C1.1, and is likewise ineligible for safety valve relief under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. *Id.* ¶ 3(c)-(d); Dkt. No. 64

¶¶ 6, 36. Finally, the Probation Office applied a three-level reduction for the Defendant's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. Dkt. No. 64 ¶¶ 34-35. The resulting total offense level is 37. *Id.* ¶ 37.

The Probation Office calculated the Defendant's criminal history as Category I, which the parties do not dispute. *Id.* ¶¶ 7, 40. Accordingly, the Defendant's Guidelines range is 210 to 262 months of imprisonment. *Id.* ¶¶ 7, 78. The Probation Office recommends a sentence of 204 months, incorporating a six-month variance pursuant to *United States v. Smith*. Dkt. No. 65. The Probation Office does not recommend a fine based on the Defendant's inability to pay. *Id.*

### IV.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, a district court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Id.* at 39. Some of the factors courts must consider pursuant to § 3553(a) include: the nature and circumstances of the offense (§ 3553(a)(1)); the history and characteristics of the defendant (same); the need for the sentence to reflect the seriousness of the offense and promote respect for the law (§ 3553(a)(2)(A)); the need for the sentence to afford adequate deterrence (§ 3553(a)(2)(B)-(C)); and the need to avoid unwarranted sentence disparities among defendants with similar records and conduct (§ 3553(a)(6)). In this case, all § 3553(a) factors weigh in favor of a substantial term of incarceration.

#### A.     The Nature and Circumstances of the Offense

The Defendant's conviction arises out of his participation in a conspiracy to import massive quantities of cocaine into the United States. From at least in or about March 2019 and continuing

through May 2021, the Defendant was at the center of a conspiracy with the ultimate goal of selling 500 to 1,000 kilograms of cocaine into the United States. The nature and circumstances of the Defendant's crime weigh heavily towards a significant term of incarceration.

As a leader in Clan de Bustamante and the Shottas, the Defendant took actions vital to accomplishing the goals of the conspiracy. First, he was the primary point of contact for negotiating the cocaine deal with the CI, including engaging in numerous discussions about trafficking more than a half ton of cocaine to the United States. Second, the Defendant coordinated two cocaine sales and deliveries to the CI and his U.S. buyers at different locations in Colombia to prove his bona fides, demonstrating his ability to source cocaine from various sources. When the first supplier in Bogota was unable to provide the total amount of cocaine that the Defendant agreed to sell to the CI, the Defendant sent the CI to another supplier in Bogota on the same day to complete the sale for the agreed upon twelve kilograms of cocaine. Last but not least, the Defendant took significant steps towards securing cocaine for the planned larger deal. He sent photos and videos of bales of cocaine on a boat, which, as SA Baker testified, appeared to be between 700 and 1,000 kilograms. Further, he sent a subordinate to a mountainous region to meet with a supplier to secure cocaine for the larger deal.

      **B.**      **The Need for the Sentence to Reflect the Severity of the Offense and Promote Respect for the Law**

The quantity of cocaine involved in this conspiracy manifests the severity of the offense. Distributing cocaine at this scale fuels not just interpersonal violence on the street level, but violent campaigns among various armed groups in Colombia and Mexico that are financed through the vast profits associated with the international cocaine trade. According to a report from the United Nations Office on Drugs and Crime, armed groups in Colombia remain heavily involved in the cocaine trade, intensifying violent conflicts in areas affected by drug trafficking and leading to a

deterioration of security conditions in Colombia.[1] The Defendant's actions undermine the integrity of United States borders; once of hundreds of kilograms of cocaine reaches the United States, it is impossible to assess the harm and strains on public health and criminal justice system.

Congress has made it abundantly clear that the United States will not tolerate the criminal activities of importing illicit drugs into our country. The Controlled Substances Import and Export Act of 1970 criminalized the manufacture and distribution of a controlled substance "intending" or "knowing" that the controlled substance would be unlawfully imported into the United States. Pub. L. No. 91-513, Title III, § 1009 (Oct. 27, 1970), codified at 21 U.S.C. § 959. Congress went further in 2016 and amended the statute to criminalize the manufacture and distribution of a controlled substance "with reasonable cause to believe" that the controlled substance would be unlawfully imported into the United States. Pub. L. No. 114-154, § 2 (May 16, 2016), codified at 21 U.S.C. § 959. Congress has been consistent and clear in its intent to disrupt the international drug trade insofar as the illicit substances are bound for the United States. The Defendant's conduct is precisely the type of conduct that Congress sought to address, and the Government's recommended sentence is proportionate to the severity of the offense and will not undermine the necessary respect for the law.

    C.    **The History and Characteristics of the Defendant**

The Defendant is a 44-year-old citizen of Colombia. Dkt. No. 64 ¶ 46. He has a history of substance abuse. *Id.* ¶ 66. The Defendant completed three years of formal schooling in Colombia. *Id.* ¶ 68. At the time of the Defendant's arrest, he operated three profitable businesses in Colombia,

---

[1] United Nations Office on Drug and Crime, *Integrated Illicit Crops Monitoring System, Monitoring of Territories of Presence of Cocoa Crops 2023*, Feb. 2025; https://www.unodc.org/documents/crop-monitoring/Colombia/Colombia_survey_report_EN_2023.pdf.

employing at least eleven people in total. *Id.* ¶¶ 71-72. The Government recognizes that the Defendant has experienced violence and hardship caused by the DTOs, paramilitary groups, and guerillas in Colombia. *Id.* ¶ 50. But the Defendant eventually became a DTO leader himself, perpetuating the vicious cycle to profit from narco-trafficking.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). It is important that the Court impose a sentence that is sufficiently potent to deter those similarly situated as the Defendant—such as high-level members of local and regional DTOs in Colombia with significant influence and access to large amount of cocaine—from selling cocaine into the United States. The message must be crystal clear: it might be easy to make a quick and considerable profit by sending cocaine to the United States, you are doing so at the risk of severe consequences: years of incarceration in the United States.

*Specific Deterrence*

The Government is concerned about the Defendant's substantial risk of recidivism. Setting aside his knowing and willful choice to engage in large-scale drug trafficking while earning legitimate income from multiple self-owned businesses, the Defendant is deeply connected to influential criminal organizations that have a powerful grab on a key cocaine hub. At his age, the Defendant can be easily reintegrated into the criminal apparatus upon his return. On the other hand,

while the Government acknowledges that the Defendant accepted responsibility by pleading guilty, it is alarming that he attempted to minimize his leadership role in Clan de Bustamante and the Shottas, despite agreeing to a two-level enhancement for his leadership role in this offense. Therefore, the Government is seeking a sentence that can be a sufficient deterrent to remind the Defendant to stay on the lawful path in the future.

### E.     Unwarranted Sentencing Disparities

Finally, § 3553(a)(6) requires a specific evaluation of similarly situated defendants "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." When determining whether a sentence creates an unwarranted disparity, courts should consider, *inter alia*, a defendant's criminal history, total offense level, Guidelines range, acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, and whether and to what extent cooperation was a factor at sentencing. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" and not unwarranted due to differences in conduct). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

According to Judiciary Sentencing Information and as reported by the Probation Office, both the average length and the median length of imprisonment imposed for defendants whose primary guideline was U.S.S.G. § 2D1.1, with a primary drug type of powder cocaine, with a total offense level of 37 and a Criminal History Category of I, and who received no credit pursuant to U.S.S.G. § 5K1.1, was 156 months.

The Defendant's co-conspirator and co-defendant in this case, Jorge Florez Alvarez, has been sentenced by this Court. Florez Alvarez was a subordinate to the Defendant in this conspiracy. Florez Alvarez introduced the CI to the Defendant, traveled on the Defendant's behalf, and personally handled the sample purchases arranged by the Defendant.

While the Defendant and Florez Alvarez both have a base offense level of 38, Florez Alvarez did not receive an aggravating role enhancement. Thus, Florez Alvarez was a zero-point offender and safety valve eligible. The Probation Office calculated Florez Alvarez's criminal history as zero, resulting in Criminal History Category I. Florez Alvarez had a Guidelines range of 108 to 135 months, and this Court sentenced him to 102 months' imprisonment, with a six-month *Smith* variance. Dkt. No. 94. The Government also views Florez Alvarez as taking full responsibility by admitting to the true scope of the conspiracy in terms of the quantity of cocaine involved. The same cannot be said for the Defendant, who contested a factual issue well-supported by evidence.

In sum, the Government's recommendation here, which is at the low end of the Defendant's Guidelines range, does not create an unwarranted disparity with his co-defendant.

## V.     CONCLUSION

For the reasons set forth above, the Government recommends a sentence of 210 months' imprisonment, five years supervised release, and a mandatory $100 special assessment.

Respectfully Submitted,

Dated: November 26, 2025                    MARGARET A. MOESER
                                            Chief
                                            Money Laundering, Narcotics and Forfeiture
                                            Section

Criminal Division
U.S. Department of Justice

<u>    /s/ Colleen King</u>
Colleen King
Roger Polack
Trial Attorneys
Money Laundering, Narcotics and Forfeiture Section
Criminal Division
United States Department of Justice
1400 New York Avenue N.W.
Washington, D.C. 20530
(202) 616-2200

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Government's Sentencing Memorandum was served through the ECF filing system to counsel of record for Defendant this 26th day of November 2025.

By:    */s/ Colleen King*
Colleen King
Trial Attorney
Money Laundering, Narcotics and Forfeiture Section
Criminal Division